CIACCIO, Judge.
On August 17, 1982 a superseding grand jury, under the authority of the Louisiana Attorney General, indicted Leander H. Perez, Jr. and Judge Eugene E. Leon for the crimes of malfeasance in office and conspiracy to commit malfeasance in office through one or more of the following acts or omissions: (1) “causing the discharge of the additional grand jury of the Parish of Plaquemines aforesaid by willfully and unlawfully preparing, presenting, filing and signing a legal pleading containing false representations and recitals (2) willfully and unlawfully denying the aforesaid additional grand jury the opportunity to exercise its statutory right to report on all offenses and matters presented and pending before it, and/or (3) willfully and unlawfully refraining from advising the aforesaid additional grand jury that it or any of its members had a statutory right to make application for direct review of its discharge to the Louisiana Supreme Court.” Additionally, a second charge of malfeasance in office was presented against Perez, in that he “filed a Bill of Information (No. 62288) in the Twenty-Fifth Judicial District Court charging James Elliott and Joseph E. Defley, Jr. with having conspired to commit the crime of extortion of District Attorney Leander Perez, Jr., between February 15-18, 1981 and in so doing he acted in bad faith, without probable cause and with the felonious intent to punish James Elliott for performing his duty as grand jury foreman.”
The defendants filed motions for bills of particular and in response the State answered and provided further specific information concerning the alleged crimes. The State advised the defendants that the criminal acts took place on February 17, 1981 at or about 12:00 noon at Belsom’s Steak & Seafood Restaurant in Gretna, Louisiana and on February 18, 1981 at or about 10:10 o’clock a.m. at the Twenty-Fifth Judicial District Court Building in Pointe-a-la-Hache, Louisiana. In furtherance of the criminal act, the State contends that a meeting took place between Leander Perez and Gilbert Andry at Perez’s house and at this meeting they discussed and planned the conspiratorial meeting which was to occur between Perez and Leon at Belsom’s restaurant. During their meeting Andry advised Perez to move to discharge the Plaquemines Parish Additional Grand Jury. Further, it is alleged that a motion was drafted which stated that the Additional Grand Jury should be discharged because it had completed its report on all offenses presented to it by the District Attorney. *1326 The State also contends that Perez and Leon knew this statement to be false and yet on February 18, 1981 at 10:10 o’clock a.m. Perez presented Leon with the motion to discharge the jury which Leon signed.
The State alleges that by these actions Perez refused and/or failed to perform and/or performed in an unlawful manner various duties required of him by constitutional articles and state statutes. More particularly, the State refers to duties imposed by La.Const. Art. 10 Sec. 30; La. Const. Art. 5 Sec. 26(B); R.S. 15:117; R.S. 16:1 C.Cr.P. Arts. 64, 415.2, 680 and Ch. 4 App. Art. 16, Cannon 7, DR7-103.
The State contends that by these actions Judge Leon refused and/or failed to perform, and/or performed in an unlawful manner a duty imposed upon him to allow the jury to report on all offenses and matters presented and pending before it. C.Cr.P. Art. 415.2. Further, he failed to inform the jury of their statutory right to a review of their discharge and this, the State contends, is a duty imposed by La. Revised Statute 15:117. Finally, the State alleges that by failing to inform the special grand jury of this right that Judge Leon violated his duty to inform the special grand jury of all of its “duties, rights and powers.” C.Cr.P. 432.
Defendant Eugene Leon moved to quash the indictment against him on two grounds: (1) The indictment failed to charge an offense which is punishable under a valid statute [C.Cr.P. Art. 532(1) ]; and (2) A bill of particulars has shown a grounds for quashing the indictment in that as it appears from the indictment together with the bill of particulars, the offense charged in the indictment was not committed or the defendant did not commit it. C.Cr.P. Arts. 532(5), 485.
Defendant, Leander Perez, Jr., relied upon the same legal grounds for moving to quash the indictment against him. C.Cr.P. Arts. 531(1), (5) and 485.
The Louisiana Attorney General subsequently dismissed the indictments and filed a bill of information charging the same offenses as were contained in the prior indictments. All parties stipulated that all existing motions would apply to the bill of information.
The district court conducted a full evi-dentiary hearing on the motions, during which numerous witnesses testified and exhibits were introduced, all without objection from the State. At the conclusion of the hearing the district judge denied the motions to quash, but he suggested that defendants apply for writs to have his ruling reviewed by the appellate court.
The defendants applied to this Court for supervisory writs and we granted certiora-ri. We allowed all parties to file briefs and make oral argument.
We reverse the judgment of the trial court denying the motions to quash and we remand the matter to the district court for proceedings consistent herewith. C.Cr.P. Art. 485.
We are presented with two issues:
(1) By bringing about the discharge of the additional grand jury before its term expired, did the defendants violate any affirmative duties required of them in their official capacities?
(2) By charging Elliott & Defley with conspiring to commit extortion did Leander Perez, Jr. violate any affirmative duty required of him as District Attorney?
SCOPE OF REVIEW
The Supreme Court of Louisiana, in the case of State of Louisiana v. Passman, 391 So.2d 1140, (La., 1980) held that the trial court properly granted a motion to quash an indictment that charged the defendant with malfeasance. The court stated:
“we find no provisions delineating affirmative duties required of defendant to administer fair and accurate testing procedures. In absence of any express requirement of him in his official capacity, he cannot be charged with refusing or failing to perform a “duty lawfully required of him.” Hence, even accepting all facts alleged in the indictment as true, Passman cannot lawfully be charged with the criminal offense of mal *1327 feasance in office. The trial judge properly sustained defendant’s motion to quash on the ground that the indictment failed to charge an offense punishable under a valid statute.”
In deciding to affirm the ruling that sustained defendant’s motion to quash the indictment, the court went outside the four corners of the indictment and referred to other documentary evidence in reaching their decision declaring, as a matter of law, that the indictment failed to state an offense punishable under a valid statute.
Although the scope of a motion to quash is usually limited to procedural matters and does not go to a defense on the merits,-this does not preclude evidence from being offered at the hearing on the motion. General rule: State v. Gerstenberger, 260 La. 145, 255 So.2d 720 (1971). Further, where evidence is introduced without objection by the State, and the facts proven at the hearing allow the court to rule on the motion, as a matter of law, the Supreme Court has used such evidence in arriving at its decision. See: State v. Atkins, 248 La. 776, 181 So.2d 779 (1966) and State v. Legendre, 362 So.2d 570 (La.1978). The instant case presents such a situation.
Code of Criminal Procedure Article 414 gives the judge the right to discharge a grand juror or the entire grand jury for legal cause. “Legal cause” is not defined but it has been construed to include the improper use of outside legal counsel. State ex rel. De Armas et al v. Platt, 193 La. 928, 192 So. 659 (1939). It obviously includes other areas of juror misconduct, such as neglect of duty, favoritism and corruption, and the Code provides for judicial review of the judge’s action by the Louisiana Supreme Court. L.R.S. 15:117.
Under normal circumstances, should the trial judge’s reason for discharging a jury be found insufficient or erroneous, the Supreme Court may reinstate the jury. The law therefore contemplates a judgment call by the trial judge, sets out no special guidelines, and provides for a remedy of reversal and reinstatement, not prosecution. All of these issues are decided as a matter of law but the very procedure set out in the Code presupposes the admissibility of evidence to sustain or reverse the trial judge’s decision.
The gravamen of the offense in this case is the charge that both defendants conspired to and, in fact, brought about the premature discharge of this grand jury to frustrate its ability to return indictments against Chalin Perez, Leander Perez, Jr. and Delta Development Co. Although the State has found it difficult to particularize the specific affirmative duty violated by the defendants, we define it as a duty not to prematurely discharge a grand jury without legal cause. It necessarily follows that a determination that there was legal cause to discharge the grand jury would negate any duty not to discharge it and may show an affirmative duty to discharge. Since the judicial review of “legal cause” necessitates an examination of the facts and circumstances preceding the judge’s action, we must review the bill of information, the bill of particulars and the testimony and documentary evidence adduced at the hearing.
FACTS
On August 20, 1979, a Special Grand Jury was impaneled by the Twenty-Fifth Judicial District Court of Plaquemines Parish. This jury was originally appointed for one year and its term was later extended for six more months. Judge Eugene E. Leon, Jr. (relator herein) was the judge who impaneled this jury. The other relator, Leander Perez, Jr., is the District Attorney for Plaquemines Parish. Because of Leander Perez’ relationship to Chalin Perez, one of the subjects of the investigation, members of the Plaquemines Parish Commission Council attempted to have Leander Perez recused from the investigation. This recusal was eventually denied by the Louisiana Supreme Court. Perez contacted the State Attorney General’s Office in an attempt to have it “advise and assist” on a limited basis, but the Attorney General declined. Giles Duplechin was eventually appointed in November 1980, to advise the grand jury as to any matter *1328 concerning Chalin Perez. (Tr. pp. 91; 409-411)
James Elliott, the foreman of this grand jury, testified that the grand jury members were instructed by Judge Leon when impaneled that the work of the grand jury was to be kept secret and that the jury members were to report to him any attempt by an outsider to contact them concerning grand jury matters. (Tr. pp. 11-12) Sometime in early 1981, Assistant District Attorney Frank Klein, who was advising the jury on all matters not concerning Chalin Perez, informed Elliott that Luke Petrovich wanted to testify before the grand jury. Because Klein had mentioned that Petrovich would be contacting him, Elliott testified he assumed this contact was exempt from Judge Leon’s prohibition against jurors communicating with outside parties concerning grand jury business, and he did not report his subsequent meetings with Petrovich. (Tr. pp. 13; 19; 44-46; 60; 74-76)
Elliott testified that he had two meetings with Petrovich at a coffee shop in Jefferson Parish. Petrovich was a member of the Plaquemines Parish Commission Council and had been subpoenaed to testify before the grand jury, but he had the subpoena quashed. At these meetings, Elliott and Petrovich discussed the problem the jury had of obtaining witnesses and of the possibility that Petrovich would testify before the jury concerning a conflict of interest between both Perez brothers and Delta Development Company, in which the Perezes were both large shareholders. Elliott testified that he never asked Petrovich for any legal advice. Elliott testified that George Pivach also contacted him concerning testifying before the grand jury. (Tr. pp 14-18; 20-21; 43-44; 61)
Luke Petrovich testified that he met with Elliott two or three times in January, 1981. Petrovich thought these meetings were instigated by the District Attorney’s Office, namely, by Klein and Perez. At these meetings he discussed the possibility that he and others would testify before the jury. Petrovich acknowledged that he might have been subpoenaed prior to this time and may have had the subpoena quashed. He testified that he told Elliott that he would testify if an “independent” district attorney was advising the jury. (Tr. pp 277; 283-285)
Frank Klein testified that Ronnie Hotz, the court reporter assigned to the grand jury, told him that Petrovich expressed an interest in testifying before the jury. Klein told Hotz to tell Petrovich to contact Elliott. He advised Elliott that Petrovich would be contacting him and suggested that they schedule a date for Petrovich to appear before the jury. Klein testified that he did not tell Elliott to meet with Petro-vich and discuss grand jury matters outside of the jury room. Klein maintained that he did not know of these outside meetings until after Petrovich appeared before the grand jury. (Tr. pp. 357-358)
Petrovich testified before the grand jury on three different occasions. His testimony addressed the income of Delta Development Company from Parish lands that were managed and controlled by Chalin Perez, as well as income to Chalin Perez derived from these lands. He also encouraged Michael Kirby, another member of the Council, to testify before the jury. Kirby testified twice in February, 1981. Kirby had previously been subpoenaed to testify but he was successful in having these sub-poenaes quashed.
At the motion hearing, Elliott testified that Petrovich was the first witness before the grand jury to testify to matters concerning Delta Development and Leander Perez, but Petrovich did not suggest that the jury consider any indictments against them. (Tr. pp. 85; 89; 270; 285; 311; 318)
Various members of the grand jury testified that after the jury heard testimony on an issue, the district attorney would leave the jury room and the jury would discuss the matter. The jury would then ask the district attorney to prepare an indictment. Once the indictment was prepared, the jury voted on the indictment. Many times the jury would return a “no true bill.” When the jury did vote to indict, the indictment was given to the district attorney, who then signed and presented it to the court. (Tr. *1329 pp. 112; 126; 175; 180-182; 188-189; 192-193; 199; 367)
Much testimony was received by the grand jury during the week ending Friday, February 13, 1981. On Friday, the grand jury voted to indict Chalin Perez for theft. Elliott testified that the jury also considered indictments against Delta Development Company and Leander Perez because the information obtained by the jury concerning Chalin Perez also brought forth possible wrongdoing by Delta Development and Leander Perez. However, some members of the jury testified that they did not remember any discussion of indictments for Delta or Leander Perez. However, both Elliott and Duplechin testified that Duplechin was asked on Friday to prepare rough drafts of indictments against Delta and Leander Perez to be submitted the next week. Duplechin testified that he advised the jury that although he could not advise the jury in these proposed indictments, he could assemble the information already given to the jury on those matters. (Tr. pp. 38-39; 95-96; 163-164; 167-169; 179; 183; 204; 433)
Elliott testified that on Sunday, February 15th, several copies of a letter written by Joseph Defley with an attached proposed resolution presented to the Commission Council were delivered to his house. Elliott opened the envelope, noticed many copies of the letter and resolution, scanned the contents, and then closed the envelope. He took the letter and resolution and their copies to the next meeting of the grand jury, the following day, February 16th. (Tr. pp. 21-28)
Joseph Defley testified that he had testified before the grand jury twice before he wrote his letter, once while Leander Perez was advising the jury and once after Duple-chin had begun advising the jury. He testified that his letter, which he maintained was merely a reiteration of his testimony, cited criminal statutes he believed had been violated by the Perez family and Delta Development Company. The proposed resolution was a copy of one he had previously presented to the Council. His purpose in sending the letter was to present options to the jury. He hoped that indicting the Perez family and Delta Development would compel them to return funds diverted from the Parish Council and the School Board. He testified that even if his plan worked, he would not receive any financial advantage. (Tr. pp. 134-136; 144; 146; 151; 153; 156-157)
Defley testified further that he intended the letter to be shown to the entire jury. He noted in the letter that.Elliott need not acknowledge receipt of the letter because he knew the jury term was going to expire very soon. He testified that no one had requested that he write the letter. The letter was not meant to be legal advice, and he did not intend for the jury to rely on his letter as the basis for any action taken against the Perez family or Delta Development. He assumed they would consult with their counsel before acting upon any of his suggestions. He did not send a copy of his letter to Duplechin because he thought Elliott would give him one. He did not send a copy to Judge Leon because he believed the judge was a close friend of Leander Perez. (Tr. pp. 137-139; 146; 148; 151-152)
Further, Defley stated that he xeroxed the letter and resolution on Sunday at the office of his friend Emile Martin. He showed the letter to both Martin and George Pivach, who rented the next door office. Both Pivach and Martin advised him not to send the letter because the jury’s term would soon expire. However, at Defley’s request, Martin delivered the letter to Elliott’s house.
On either Monday, February 16th or Tuesday, February 17th, Elliott took the letter, resolution, and their copies to the grand jury room and distributed them to the entire jury. He testified that he was not sure if Duplechin or Klein got a copy of the letter. He also stated that he did not inform Judge Leon of the letter’s existence because he assumed Duplechin or Klein would tell the judge if the letter was improper. However, he admitted that he did not ask either of them if the letter was proper. (Tr. pp. 24; 29-30)
*1330 Elliott testified that he. distributed the letter and resolution to the jury because he felt he was under an obligation to submit to the jury any information uncovered by the jury’s investigation. He personally considered it to be almost a “crank letter,” but he did not think that it was within his discretion to ignore it. He did not request the letter or any advice from Defley. He testified that in hindsight he supposed the letter and resolution could be construed as an attempt to influence the jury, but at the time he received them he considered them to be merely a reiteration of Defley’s testimony, not an improper attempt to contact the jury. (Tr. pp. 34-36; 40; 53; 55-57)
Duplechin testified that he saw a letter in the grand jury room that had been brought in by Elliott. Duplechin heard Elliott tell Ronnie Hotz, the court reporter, that the letter had been delivered to him and that the grand jury would discuss the letter. However, the letter was not discussed while Duplechin was in the jury room. Duplechin did not receive a copy of the letter and he did not read it until after the jury had been discharged. He testified that he knew the letter was from a former witness. Because grand jury testimony is secret, he believed he could not reveal the letter’s existence to Judge Leon. However, Duplechin testified that had he known the nature of the letter, he would have reported it to the judge because he deemed the letter to be giving legal advice. (Tr. pp. 91-93; 111; 131)
None of the members of the grand jury present at the hearing testified that they discussed Defley’s letter. Some of them saw the letter but did not read it. Some did not even remember seeing the letter. They all testified that the letter played no part in their decision to indict Leander Perez and Delta Development. (Tr. pp. 25; 54-55; 159-161; 164-165; 171; 178; 185; 187; 191; 193; 196-197; 200; 202-204; 207; 211)
After having been requested to prepare the rough drafts of the indictments for Leander Perez and Delta Development, Du-plechin realized that he would need to assemble a great amount of facts in a very short time. Duplechin testified that he believed that the law allowed him to seek assistance from an attorney to prepare these documents. Duplechin enlisted the aid of Petrovich, an attorney and a key witness against Leander Perez and Delta Development to help prepare the indictments. He asked Petrovich to set forth the substance and fact situations supporting the proposed indictments. Duplechin testified that he used the long form of indictment to avoid discovery problems. He also noted that Petrovich had assisted him in preparing earlier indictments against Cha-lin Perez, including the one returned on Friday. (Tr. pp. 95-99; 108; 118; 269)
Duplechin and Petrovich met at Duple-chin’s office in Gretna at about 7:00 p.m. on Monday, February 16th. Petrovich brought and referred to copies of documents that had been introduced to the grand jury concerning Leander Perez and Delta Development. The two men worked at the office for a few hours, and then Duplechin instructed Petrovich to complete the indictments using as a model an old indictment against Chalin Perez. Duple-chin requested that the final indictments be delivered to him the next morning. (Tr. pp. 98-99; 250-257; 307)
Petrovich then went to his office in Bu-ras and eventually enlisted the aid of Michael Kirby, an attorney and fellow member of the Plaquemines Parish Commission Council, and three typists to complete the indictments. Petrovich testified that he did not ask Duplechin if he could enlist outside help. Kirby typed a historical narrative for the Delta Development indictment. Petro-vich testified that he did not tell Kirby that they were preparing indictments; he told Kirby they were doing work “for the Parish.” Kirby left sometime between 6:00 and 8:00 a.m., and the indictments were completed sometime between 8:00 and 9:00 a.m. on Tuesday, February 17th. (Tr. pp. 257-261; 265-267; 317)
Michael Kirby testified that when he arrived at Petrovich’s office at about 4:00 a.m., Petrovich, Janice Acosta, Leander Jurjivich (Petrovich’s assistant), and possibly Gloria Horton were already present. *1331 Petrovich told Kirby that he needed his help in preparing an indictment against Delta Development. Petrovich asked him to prepare a fact summary for the indictment based upon testimony Kirby had heard at Council meetings concerning its investigation into oil, gas, and mineral leases. Kirby acknowledged that his testimony before the grand jury did not encompass this subject. (Tr. pp. 310-312; 316; 321)
Kirby testified that he assumed Petro-vich was preparing the indictment on his own to submit to Duplechin. Although this indictment was the only one he helped to prepare, he had worked with Petrovich before in the middle of the night. Kirby testified that he never saw the final draft of the proposed indictment, but he noted that the one presented to him in court contained only minor changes from the parts that he wrote and typed. He did no work on the indictments against Leander or Chalin Perez. He and Petrovich did not discuss their testimony before the grand jury. (Tr. pp. 299; 302; 313-315; 321-322)
Mary “Petie” Chevalier testified that Pe-trovich contacted her about 6:00 a.m. and asked her to come to his office to do some typing. She has an independent clerical service, and she had never before worked for Petrovich. She typed the middle portion of the indictment against Leander Perez. She testified that Petrovich did not warn her to keep this work a secret. She also testified that she had never before typed an indictment, and she did not subsequently bill Petrovich because she did not want to leave a record of her work. (Tr. pp. 329-333)
Both Janice Acosta and Gloria Horton worked for the Parish Council. Ms. Acosta was called about 4:30 a.m. by Petrovich and asked to come in to the office and do some typing. When she arrived about 6:00 a.m., Petrovich and Kirby were at the office. Petrovich gave her some papers to type, but she did not know what they were. None of the papers had the word “indictment” on them, but the subject of the papers was Delta Development. Ms. Acosta called Ms. Horton about 6:30 a.m. and asked her to come to work early. Ms. Horton testified that Petrovich, Kirby, Jur-jivich, Ms. Acosta, and Ms. Chevalier were present when she arrived. Ms. Horton recalled that she typed papers dealing with Delta Development. Neither Ms. Acosta nor Ms. Horton were paid for their work, nor were they advised to keep this work secret. (Tr. pp. 333-341)
Petrovich testified that he had the indictments delivered to Duplechin at his office near the grand jury room of the Belle Chasse lockup, but he did not remember who actually delivered the indictments. Petrovich was not at the lockup on either Tuesday or Wednesday. Petrovich testified that he agreed to work on the indictments because he believed that Duplechin had the power as district attorney ad hoc to order him to help prepare them. He testified that the final indictments which were shown to him in court were very similar to the ones he prepared, and the indictments he prepared contained information that was drawn from his prior testimony before the grand jury. (Tr. pp. 250; 260; 267-268; 270-271; 292; 297-298).
Duplechin testified that the envelope from Petrovich was delivered to him on Tuesday morning. The envelope contained three proposed indictments: one against Delta Development for theft, one against Leander Perez for theft, and one against Chalin Perez for malfeasance. Duplechin took them to Elliott and told him that he (Duplechin) could not advise them on the indictments against Leander Perez and Delta Development. Duplechin testified that he telephoned Judge Leon to inquire whether he could advise the jury on these matters because they were related to and a product of the investigation of Chalin Perez. However, Judge Leon told him that he could not advise them on these indictments and suggested that he get Prank Klein to do so. Duplechin did not re-enter the jury room, although he did remain in his office all day in case a matter arose concerning Chalin Perez. (Tr. pp 100-106) Duplechin testified that the indictments shown to him in court were similar to those he received from Petrovich and given to Elliott. He did not authorize anyone other than Petro-vich to prepare the indictments, and he was *1332 unaware that anyone else had done so. He did not consider the preparation of these drafts to be giving legal advice. (Tr. pp. 100-101; 106; 132)
None of the grand jury members who testified knew that Petrovich and Kirby had drafted these indictments. They all testified that the jury did not seek legal advice from Petrovich or Kirby, nor did these men have any legal function with the jury. (Tr. pp. 43; 46; 64; 72-73; 161-162; 166-167; 186; 190-192; 195-196; 199; 202; 205; 211)
Frank Klein testified that at approximately 10:00 a.m., on Tuesday, February 17th, Elliott asked him to enter the jury room and presented him with a proposed indictment of Delta Development that Elliott said the jury wanted to have retyped. Klein asked him a few questions to make sure exactly what the jury wanted in the indictment. He then gave the indictment to a secretary to type. While it was being typed, Klein called Leander Perez and informed him that the indictment was being prepared. Perez told him to sign the indictment. When Klein took the completed document into the jury room, Elliott presented him with a proposed indictment of Leander Perez. Klein then told the jury that he could not sign the indictment because the entire district attorney’s office would have to recuse itself. (Tr. pp. 348-354)
Klein called both Leander Perez and Judge Leon and told them of these proposed indictments. Klein took with him a copy of the indictment against Delta Development. Klein advised Perez to recuse himself from both of these-indictments, and Perez directed him to prepare the recusal motion for the next morning. At that time, Perez expressed concern that Petrovich was attempting to influence the jury, while Judge Leon thought that Kirby might be trying to do so. Klein called Elliott and told him that he would not return to the lockup that day, he would not sign the indictments, and that the district attorney’s office would recuse itself. Perez and Klein met again that day at approximately 5:00 p.m. (Tr. pp. 349-352; 364-365; 375)
The grand jury voted to return indictments against Leander Perez and Delta Development late in the morning of Tuesday the 17th. Elliott testified that the jury’s decision to return these indictments was based only upon what they gleaned from testimony before the jury and was not due to any outside influence. However, the jury did not have a legal advisor to sign or present these indictments to the court, and the jury believed that these indictments could only be presented to the court by a legal advisor. Duplechin suggested that Elliott contact the Attorney General’s office for advice. Elliott called Judge Leon four times and told him that the jury had voted to return some indictments but that they could not get a district attorney to sign and present them to the court. Judge Leon finally advised them that although he could find no answer that day, he would try to find a solution to this problem the next day to get the indictments signed and presented to the court. The jury then adjourned at about 4:30-5:30 p.m. (Tr. pp. 31; 37; 49-51; 64-66; 80; 107; 176; 184; 198; 204)
Just before the jury adjourned on Tuesday, Elliott gave Ronnie Hotz, the court reporter, a copy of the letter and another document (probably the attached resolution) to include in the record as an “exhibit.” Hotz testified that he had never had such a request before. When he delivered the remaining transcripts of the grand jury to Judge Leon before court convened on the following morning, Wednesday the 18th, Hotz also gave the judge the letter and resolution. Judge Leon took the documents and told Hotz that he would “take care of it.”
Elliott testified that he and the other jurors were “uneasy” when they adjourned on Tuesday evening. Elliott contacted George Pivach, his friend and brother-in-law, about 7:00 p.m. and told him that the jury was concerned and wanted some outside support. Elliott testified that he did not tell Pivach about the indictments, but news of them had leaked to the press. Elliott also contacted the governor’s office, the state police, and the Attorney General’s *1333 office in an effort to have some state troopers present when the jury reconvened the next day. (Tr. pp. 48; 66-68; 223-226)
Klein testified that as of Tuesday evening he had not prepared a press release of the indictments and the pending recusal of the district attorney’s office. However, reporter Richard Angelico told Klein over drinks on Tuesday evening that he knew the indictments and recusal were forthcoming and that he doubted that a new advisor could be appointed in time to sign and present the indictments because the jury term would expire in two days. (Tr. p. 371)
Gilbert Andry, an assistant district attorney in Plaquemines Parish, was contacted by Leander Perez late on Tuesday afternoon. When Andry arrived at Perez’ house, Perez told him about the proposed indictment against Delta Development and showed him a copy of the indictment against himself as well as a copy of the Defley letter. Andry and Perez discussed alternative actions that Perez could take. Perez told Andry that Klein told him earlier that day Elliott kept leaving the jury room whenever Klein would ask him a question and then would answer Klein upon re-entering the room. Andry testified that both Klein and Perez suspected that Elliott was receiving legal advice from an improper outside source. Klein did not mention this incident in his testimony. (Tr. 412, 413)
Perez and Andry then decided to call John Mamoulides, the District Attorney of Jefferson Parish, in order to obtain his advice concerning Perez’ future actions. Andry explained that they had a problem with the special grand jury which possibly had been tainted. Andry read portions of the Defley letter to Mamoulides, and then mentioned that there were proposed indictments against Leander Perez and Delta Development. After discussing who was authorized to advise the grand jury concerning matters other than Chalin Perez, Mamoulides told Andry that he would move to discharge a grand jury which he suspected had been tampered with or which had received improper legal advice. Mamoul-ides told Andry that if the district attorney was finished with the jury, and if the jury had made no “presentment” to them, then he would move to discharge the jury. However, he also advised Andry to consult with Duplechin to make sure he was also finished with the jury before moving to discharge it. (Tr. pp. 378-382; 414-415)
Mamoulides testified that because the jury was a special grand jury, the district attorney may use a general motion to discharge without specifying the grounds for the discharge other than stating that the district attorney was- finished with it. However, the jury would still have the right to make a “presentment” to the court of any pending matters. Mamoulides testified that once he knew that someone had attempted to influence a jury, he would then try to determine whether such influence actually tainted the jury by observing what the jury did as a result of the tampering. Given a hypothetical situation similar to the one in this case, Mamoulides testified that he considered it to be “very close” to jury tampering. If that jury then came up with proposed indictments that he knew nothing about, he would think that the jury was tainted. He stated that the Defley letter seemed to be advising a course of extortion. (Tr. pp. 384; 389-391; 393-394)
Mamoulides further testified that if the letter was a continuation of the author’s testimony, he would probably not mention the letter in the motion to discharge because of the secrecy of grand jury testimony, but he would show the letter to the judge. However, he did not have sufficient facts in order to determine whether the letter was a continuation of grand jury testimony. If the jury were tainted, there would no longer be a reason for it to exist because its actions would lead to improper indictments. Mamoulides testified that he would move to discharge any jury that suddenly presented an indictment against him that was the result of information from another source. However, he admitted that he had never dealt with a grand jury which had a district attorney ad hoc as its advisor. (Tr. pp. 392-399)
Andry denied that Mamoulides advised them to check with Duplechin before mov *1334 ing to discharge the jury. He testified that Perez told him that the jury’s work was finished. Perez did not mention to him the existence of the proposed indictment against Chalin Perez for malfeasance that was pending before the jury. He also testified that they did not at that time attempt to find out who had drafted the indictments against Leander Perez and Delta Development. (Tr. pp. 423; 428; 430-431)
Andry prepared the motion to have the jury discharged, had it typed the next morning (Wednesday the 18th), and then gave it to Perez. The motion did not mention the letter because Andry and Perez thought the letter might be considered to be testimony and, therefore, was confidential. When Perez gave the motion and letter to Judge Leon, the judge told them that he would have dismissed the jury on his own initiative. (Tr. pp. 416-418)
When the grand jury reconvened on Wednesday morning, the jurors once again voted to indict both Leander Perez and Delta Development because they thought that the jurors who presented the indictments had to be the same jurors who signed them, and the make-up of the jury on Wednesday was different from that on Tuesday. The jury was ordered to report to Judge Leon’s courtroom, and Judge Leon told Duplechin that he need not attend because nothing would be handled that was relative to him. When the jurors appeared before Judge Leon, he told them that the special grand jury was discharged because it had completed its work. Judge Leon then informed Elliott that he and Defley were charged with conspiracy to commit extortion. (Tr. pp. 49; 122; 173; 214)
Earlier on Wednesday morning, Klein prepared a press release concerning the motion to recuse which he gave to a reporter at the lockup. Klein went to Perez’ home to deliver the motion, but he learned that Perez was already at the courthouse in Pointe-a-la-Hache. When Klein subsequently entered the courtroom, he found Perez and his first assistant already there. Perez handed Klein the motion and signed order to discharge the jury, as well as a copy of Defley’s letter which Klein had never before seen. The motion merely stated that the jury was to be discharged because it had completed its business. Klein then prepared a new press release.
. At the motion hearing, a few jurors testified that they were surprised by Judge Leon’s pronouncement that the jury had completed its business because they were sure he knew that there were matters still pending. The jury itself was never asked if it had finished all its business. Elliott testified that he personally had told Judge Leon that the jury wanted to research further some matters in addition to the indictments that they could not get signed and presented. Duplechin testified that the jury had set some matters aside to review in the last days of its term. He testified that no one asked him if the jury had finished the matters he was handling. (Tr. pp. 78-79; 88; 172; 214-215; 435; 437)
Klein testified that Perez gave a “farewell speech” on Monday to the grand jury. Some of the jurors at that time mentioned possible “loose ends” that might not be resolved before the jury’s term expired. Perez told them that there were other ways to charge people besides by indictment, and he and Klein would review the grand jury testimony to take care of any pending matters. While Perez was still in the jury room, one of the jurors mentioned two proposed extortion indictments. Klein said that he advised the jury that he felt there was no basis for these indictments, but he subsequently left blank indictments for these on Elliott’s seat in the grand jury room. Klein also testified that he never heard any testimony presented which would have lead to the indictments against Leander Perez and Delta Development. (Tr. pp. 356, 359-363)
Three jurors (including Elliott) did not remember this “farewell speech” given by Perez. However, court reporter Ronnie Hotz did remember such a speech being made by Perez early Monday morning. (Tr. pp. 84; 177; 215; 401-405)
Klein testified that while he did not tell the jurors that the indictments needed to be signed and presented by a district attor *1335 ney nor did he advise them that they did not need a district attorney for such purposes as he was never asked the question. Andry testified that the jury was not informed when it was discharged that it could still present indictments after discharge in matters it had considered before its discharge. Neither was the jury informed that it could take supervisory writs to the Louisiana Supreme Court concerning the validity of its discharge. Duplechin also testified that he did not advise the jury it could take writs concerning its discharge, although he knew they had such a right and he was in the grand jury room area when he was informed of their discharge. (Tr. pp. 119; 355; 368-369; 425)
In response to questioning at the hearing, Elliott admitted that the jury found no overt uncooperation by Judge Leon. Du-plechin also testified that Judge Leon seemed to be cooperative and did not seem to impede his work with the jury. (Tr. pp. 71; 94)
[[Image here]]
Relator, Judge Eugene Leon, argues that the bill of information fails to charge an offense which is punishable under a valid statute because he was required by law to discharge the grand jury since it was functioning pursuant to certain impermissible irregularities. Further, he contends that even if the allegations of the bill of information are true they do not constitute the crime of malfeasance because a judge has no legal duty to present, file or sign legal pleadings; nor does he have a duty to compel a grand jury to report on all matters presented or pending before it; nor to advise them that they have a right to apply for review of their discharge.
Relator, Leander Perez, Jr., argues that, as District Attorney, he was under a positive duty to dismiss the Additional Grand Jury once he became aware that it was operating pursuant to certain impermissible irregularities. Accordingly, his actions taken towards this end were justified as the reasonable fulfillment of his duties of public office. Further, he contends that his actions in charging James Elliott and Joseph Defley with conspiracy to commit extortion was also an exercise of his broad discretionary powers. Therefore, Perez reasons that the bill of information fails to charge an offense punishable under a valid statute and further, that the bill of information, when considered with the bill of particulars makes it apparent that the crime alleged was not committed. Additionally, Perez contends that if any duty existed to advise the jurors of their right to a review of their dismissal that it was the duty of the district judge and not that of the district attorney. C.Cr.P. Art. 532(3), 495.
WAS THERE LEGAL CAUSE TO DISCHARGE THE GRAND JURY?
THE DEFLEY LETTER
Joseph E. Defley, Jr., an attorney from Plaquemines Parish, voluntarily appeared before the Grand Jury on two occasions to offer evidence that he believed would assist in the indictment of Chalin and Leander Perez, Jr. and Delta Development Co. Fearing that some of the indictments he desired might not be handed down before the term of this jury expired, he prepared a letter addressed to the foreman of the Grand Jury and enclosed copies for every member. The letter and accompanying resolution are attached to this opinion as Appendix “A”.
Defley testified that he was not asked to write the letter but he did so in order to amplify his testimony. He did not consider the letter improper nor did he consider it to be legal advice. Our examination of the letter shows he was in error no matter how well intentioned.
The letter is replete with accusations and inferences of wrongdoing on the part of the late Judge Perez and his children, who are designated as “co-conspirators, and direct, willing participants in and beneficiaries of the fraud.” Portions of the letter state:
“I am convinced that the solution must be political, rather than judicial. And I have been pondering the problem — trying to find an answer. I always knew *1336 that if sufficient pressure could be brought on the Perezes so as to make them consider a return of the oil lands and leases, the Parish would be the richer, by many millions of dollars.
The solution was suggested by the latest indictment of Chalin. An astute District Attorney might just be-able to bargain with Chalin toward reducing the charge, or taking a light sentence in exchange for a plea or, if necessary dropping the charge altogether, in exchange for Chalin’s relinquishing any and all claims which he or Delta Development might have on Parish Lands.
This does not address the question of how pressure is to be put upon Lea and the two sisters, as well as Delta Development and the officers of that company, including Mr. Eustis.
My feeling is that they are in a position to be charged as principals in a criminal conspiracy to commit theft of public funds by fraud committed on the Parish. The original scheme, of course, dates back to 1934, but the conspiracy continues, even up to the present time. La.Rev. Statutes 14:26; 14:67.
In addition to this, they could be charged with receiving stolen things. La. Revised Statutes 14:69.
They could also be charged as accessories after the fact, in that they helped their father, and continue to help Delta Development Company and Mr. Eustis, to bilk the public in an ongoing scheme of fraud. La.R.S. 14:25.
Lea Perez could further be charged with malfeasance in office, for deliberate failure and refusal to investigate and prosecute the theft of public funds, which is continuing.
Perhaps, if enough pressure could be put on them, all the Perez family, as well as Delta Development, and other companies which may be involved in the scheme, could be persuaded to cough up their ill gotten gains, in order to avoid the penalties of law.”
The letter was in the hands of every member of the grand jury before they voted on the Perez and Delta Development Co. indictments. Not only did it constitute improper and unauthorized legal advice, as found by the trial judge, but it was an intrusion into the deliberations of the grand jury. The letter, although couched in the language of suggestions, in fact was a recommendation for the grand jury to indict the named persons for specific offenses, a course of conduct prohibited to even the District Attorney. State v. Richey, 195 La. 319, 196 So. 545 (1940); See: State v. Kifer, 186 La. 674, 173 So. 169, (1937).
Defley’s letter was a direct written communication made to grand jurors for the purpose of influencing their actions in a matter pending before them. In the persuasive authority of Duke v. United States, 90 F.2d 840 at 844 (4th Cir.1937), cert. denied, 302 U.S. 685, 58 S.Ct. 33, 82 L.Ed. 528 (1937) (cited with approval in U.S. v. Neiswender, 590 F.2d 1269 (4th Cir.1979), the court states:
“And one who knowingly sends a letter to a grand jury which shows upon its face the intention that it shall be considered with respect to a pending case, cannot be heard to say that he did not attempt to influence the grand jury thereby, as the attempt to influence is inherent in the act of knowingly sending such a letter.”
Although none of the jurors, except Elliott, bore any responsibility for receiving this illegal communication, their future actions were irrevocably tainted and any indictments of the parties named in the letter would have been properly quashed. We acknowledge that none of the jurors who testified admitted to being influenced by the letter, even though the indictments bear a striking similarity to the scenario suggested therein.
In State v. Revere, 232 La. 184, 94 So.2d 25 (La.1957) the Supreme Court held that the mere presence of an investigator from the District Attorney’s office in the grand jury room for the purpose of operating a transcribing machine was grounds for quashing an indictment even though the investigator had been administered an oath *1337 of secrecy and there was no showing of actual prejudice. The Court stated:
Another point frequently overlooked is that it is not the fact that prejudice actually resulted that is of primary and vital concern, but that an opportunity was made possible to exert prejudice and influence on members of the grand jury that must be guarded against. State v. Revere, supra 94 So.2d at 33.
In addition, the letter constituted evidence not submitted under oath and not received in the normal course of the grand jury proceedings.
Therefore, we find as a matter of law that there existed legal cause for discharge of the entire grand jury and each of its members.[1] Accordingly, since these defendants had no duty not to discharge this grand jury, they cannot now be charged with malfeasance for doing that which they had a legal right to do. This is so even if the defendants were improperly motivated as the State contends they were.
Malfeasance presupposes the existence of an affirmative duty. R.S. 14:134. In this case the State contends that the duty which existed was a duty to allow the special grand jury to serve out its term and make its reports before being discharged. Normally, this would have been the case; however, this grand jury was so tainted as to be legally inoperative and legal cause existed for its discharge. As a result of our review of the bill of information, the bill of particulars and the evidence adduced at the hearing, we find, as a matter of law, that no duty existed which required the District Attorney and the trial judge to permit this body to continue operating. Accordingly, we hold that Leon and Perez cannot lawfully be charged with the criminal offense of malfeasance in office by conspiring to or by causing the discharge of the additional grand jury as the bill of information fails to charge an offense punishable under a valid statute and the bill of particulars and evidence show that the offenses charged were not committed and these defendants did not commit them. See: State v. Passman, supra.
Leon and Perez are also charged with: filing a legal pleading containing false representation; denying the grand jury its right to report on matters pending before it; and, unlawfully failing to advise the grand jury of its right to appeal to the Louisiana Supreme Court for relief.
The motion filed by Perez did not state its true basis, namely, the tainting of the jury by the Defley letter. Fear of invading the secrecy of the grand jury is offered as the reason for using the inaccurate language. However, the letter was given by Perez to Judge Leon with the motion so that the language used in the motion is irrelevant.
The motion stated, in part, that the “Grand Jury has completed the functions for which it was impaneled and has completed its report on all offenses presented to it by the District Attorney.” The State contends the grand jury was deprived of its statutory right to make its report under Code of Criminal Procedure Art. 415 and relator responded by asserting that the only pending business was the irrevocably tainted Perez-Delta Development Company indictments.
Since Judge Leon discharged the grand jury for legal cause, the jury had no right to take any further action unless authorized, upon review, by the Supreme Court. At the lengthy hearing below no evidence was adduced to indicate that this grand jury had any other matters pending than the Perez-Delta Development Co. indictments.
Our courts have consistently held that we will not be bound by the form of pleadings but look at their substance. We find, in light of the foregoing, that the motion filed by Perez and signed by Leon cannot form the basis for a charge of malfeasance.
*1338 No one informed the members of the grand jury of their right to appeal directly to the Supreme Court for review. Judge Leon and District Attorney Perez deny that it was their duty and each suggests, if there was a duty, it was owed by the other party. District Attorney ad hoc, Duple-chin, was aware of the provisions of R.S. 15:117, was present in the grand jury room area when the jury was discharged, but he also failed to advise them, and gave no explanation for his actions.
Judge Leon charged the grand jury in open court and by written charge filed in the record, in accordance with Code of Criminal Procedure Article 432. The charge covered every matter pertaining to their duties, rights and powers as set forth in Code of Criminal Procedure, specifically, Articles 431 thru 444. However, the charge did not cover the provisions of Louisiana Revised Statute, Title 15, Section 117. Although these provisions were originally contained in the 1928 Code of Criminal Procedure they were deleted from the new Code because these provisions were considered “minutiae”. The Official Revision Comment to C.Cr.P. Art. 414 states:
(b) The provisions of Art. 189 (parishes other than Orleans) and Art. 200 (Orleans Parish), of the 1928 Code relative to the right of a discharged grand juror to appeal to the supreme court have no place in the new Code. Those provisions are minutiae, and accordingly are omitted from this Code and are transferred to the Code of Criminal Procedure Ancillaries in Title 15 of the Revised Statutes by supplemental legislation.
Apparently the redactors of the new Code came to this conclusion because no more than two or three cases existed in our jurisprudence dealing with this subject matter since 1928. Whatever the rationale, it is obvious that the new language contained in R.S. 15:117 defines a course of action available to discharged jurors but it does not, on its face, state who, if anyone, has the responsibility of informing them of this right of judicial review.
Thus, we conclude that R.S. 15:117 does not impose an affirmative duty on anyone to specifically charge the grand jury on its provisions. If a deficiency exists in the law it is within the province of the Legislature to correct it. Although it would have been preferable for either Judge Leon, District Attorney Perez or District Attorney ad hoc Duplechin to have advised the jury of this procedural remedy we do not find the requirement of an affirmative duty to do so. Therefore, the failure of Leon and Perez to advise the jury subsequent or prior to their discharge cannot form the basis of a charge of malfeasance.
The third count of the information deals with the bill of information Perez filed against Elliott and Defley for extortion and the State charges that this was done “in bad faith, without probable cause and with the felonious intent of punishing Elliott for performing his duty as grand jury foreman.” Perez argues that the filing of the bill falls within his broad discretionary powers under Code of Criminal Procedure Article 61. We agree. Under the provisions of Louisiana Constitution, Article 5, Section 26(B) the district attorney is placed in charge of every prosecution in his district. The language of Code of Criminal Procedure, Article 61 is extremely broad in defining the powers and duties of the District Attorney.
Art. 61. District attorney; powers and duties
Subject to the supervision of the attorney general, as provided in Article 62, the district attorney has entire charge and control of every criminal prosecution instituted or pending in his district, and determines whom, when, and how he shall prosecute.
We construe this language to give the District Attorney broad, if not, complete discretion in determining “whom, when and how he shall prosecute.” See: Hall v. City of New Orleans, 385 So.2d 1253, (La.App. 4th Cir., 1980) His actions in filing a bill of information violate no affirmative duty that can form the basis of a charge of malfeasance. ■
*1339 We do not say that an aggrieved party is powerless to take action against the District Attorney and our laws provide the remedy of recusal when such action is appropriate. C.Cr.P. Arts. 680-682. There may also be civil actions available. Crier v. City of New Orleans, 365 So.2d 35 (4th Cir., 1978) Whatever the remedy may be it is not by way of a criminal charge of malfeasance.
For the reasons assigned the judgment of the district court denying the defendants’ motions to quash is reversed, the bill of information is quashed, and the case is remanded to the trial court for appropriate proceedings not inconsistent with this opinion.
REVERSED AND REMANDED.
APPENDIX A
February 15, 1981
Mr. James Elliott
103 Hodge Avenue Belle Chasse, Louisiana
Dear Mr. Elliott;
Only four more days for the grand jury to complete its work. I don’t envy you, because I’m sure that you have a great deal to attend to.
I hope that you will forgive this intrusion, but I was anxious to bring some ideas out which might assist the grand jury in attempting to cut down on the corruption in the Parish.
For years, I have heard people say that what Judge Perez did in forming Delta Development and fraudulently diverting mineral leases to that corporation was “not illegal — just unethical”.
I disagreed with this, and on April 2, 1981, I read a proposed resolution before the Commission Council in which I outlined the fraudulent scheme by which Perez bilked the public of uncounted millions of dollars.
A copy of this resolution is enclosed — it is the same one which 60 Minutes filmed.
I believe that Luke Petrovich concurs with me in connection with my theory of the case. And for the first time, when I read of the most recent indictment, I saw that someone else — the grand jury — also thought that the scheme was fraudulent from its inception, in 1934. And of course, if you once concede that, then the children, who were given sole ownership of Delta Development in 1940, were co-conspirators, and direct, willing participants in, and beneficiaries of, the fraud.
Parenthetically, I think that I should mention that I have two objectives in mind as far as Plaquemines Parish is concerned —first, to try to clean up the government, and it is my belief that this can only be done by establishing some kind of representative government, and secondly, to try to restore the oil lands to the school board, ... and the council, from whom they were stolen. It is not my desire to see ANYBODY go to jail, although sometimes I realize that this is necessary, either to protect the public, or to discourage others from committing the same acts.
It appears that the power of the Perez family may be seriously eroded, and if we are successful with the reapportionment suit, we should see representative government established. Which leaves the problem of reacquiring the lands.
If we file a civil suit, it could take twenty ■ or thirty years for it to be resolved. In addition, the defendants would initially be the Perez children, who were willing accomplices to their father’s larcenous acts. But if one or more of the children die, and the grandchildren inherit Delta Development, a court hearing the case several years from now might be reluctant to divest them of their property rights, when by no stretch of the imagination could they be said to have been privy ■ to the original wrongdoing.
I am convinced that the solution must be political, rather than judicial. And I have been pondering the problem — trying to find an answer. I always knew that if sufficient pressure could be brought on the Perezes so as to make them consider a return of the oil lands and leases, the Parish would be the richer, by many millions of dollars.
*1340 The solution was suggested by the latest indictment of Chalin. An astute District Attorney might just be able to bargain with Chalin toward reducing the charge, or taking a light sentence in exchange for a plea or, if necessary, dropping the charge altogether, in exchange for Chalin’s relinquishing any and all claims which he or Delta Development might have on Parish Lands.
This does not address the question of how pressure is to be put upon Lea and the two sisters, as well as Delta Development and the officers of that company, including Mr. Eustis.
My feeling is that they are in a position to be charged as principals in a criminal conspiracy to commit theft of public funds by fraud committed on the Parish. The original scheme, of course, dates back to 1934, but the conspiracy continues, even up to the present time. La.Rev. Statutes 14:26; 14:67
In addition to this, they could be charged with receiving stolen things La. Revised Statutes 14:69/
They could also be charged as accessories after the fact, in that they helped their father, and continued to help Delta Development Company and Mr. Eustis, to bilk the public in an ongoing scheme of fraud. La.R.S. 14:25.
Lea Perez could further be charged with malfeasance in office, for deliberate failure and refusal to investigate and prosecute the theft of public funds, which is continuing.
Perhaps, if enough pressure could be put on them, all the Perez family, as well as Delta Development, and other companies which may be involved in the scheme, could be persuaded to cough up their ill gotten gains, in order to avoid the penalties of law.
I understand that you might have difficulty in considering indictments as outlined, because of one or more court orders, and for one reason or another, you may decide that my suggestions are not practical. I merely put them to you as being possible courses of action — you will have to consult counsel and make your own decision concerning these matters.
Please feel free to share the ideas that I have outlined, and to discuss them with the grand jury. If you want me to appear to outline these ideas, I shall be happy to— just have the secretary call me.
I hope that you will not mind my writing you — I feel a certain sense of desperation because of the short time left to the grand jury, and decided that this was the quickest means of communicating with you.
You need not bother acknowledging receipt of this letter — if you need any further information, please call me.
Thank you very much for the major effort which you and the other members of the grand jury are making — you are doing a real service to the people of the Parish of Plaquemines. Your courage and leadership will be long remembered.
Yours truly,
s/ Joseph E. Defley, Jr.
Joseph E. Defley, Jr.
P.S. The purpose of this letter is to serve as a continuation of my testimony; it is not intended for general circulation. I would appreciate your confining its dissemination to those who have a “need to know”, as we used to say in the Marine Corps.
RESOLUTION
WHEREAS, the late “Judge” Leander H. Perez, Sr., while occupying a position of public trust, formed a corporation known as “Delta Development, Inc.”, in 1934, which was solely controlled by him and by his children, who were designated by him as stockholders. And whereas the purpose, intent and effect of forming said corporation was to divert public funds to the use and benefit of the late “Judge” Perez and his family,
And whereas such action on the part of the late “Judge” Perez constituted 'a serious breach of that fiduciary duty which he owed, as a public official, to the various public bodies which he served as attorney, advisor, and elected official,
*1341 And whereas, as a public official, he had a duty to secure contracts, leaseholds and royalties in such a way as would provide the greatest possible benefit to the public bodies which he served,
And whereas, instead, he took advantage of corporate opportunities and inside information to procure for himself and his heirs, vast sums of money from production on public lands through the said Delta Development Company, Inc., rather than affording the public bodies which he served the information, advice, counsel and occasion to profit from said opportunities to the fullest extent to which they were entitled.
And whereas, with full knowledge of his wrongdoing and his breach of fiduciary duty, he failed to notify the various public bodies which he represented, or to advise them, of the fact that he was taking advantage of them, or profiting unlawfully from public leases,
And whereas his heirs, even to this day, refuse to disclose the unlawful profits which they are taking from leases on public lands through the said Delta Development Company, Inc.,
And whereas, such profits, amounting to many millions of dollars, have been and are being taken, only as the result of a gross breach of every legal, ethical and moral obligation which the late “Judge” Perez had toward the public bodies which he purported to serve, and amounted to speculation of the most blatant sort,
NOW THEREFORE, be it resolved, that the Plaquemines Parish Commission Council will no longer tolerate the unlawful, unethical and immoral diversion of public monies for the private benefit of the Perez family.
Be it further resolved that the Council require a strict accounting from the Delta Development Co. of any and all profits, rents, royalties and payments of whatsoever nature and kind received by it in connection with leases, sales, or agreements of any kind relating to public lands, including but not limited to lands belonging now or formerly to the PPCC, Plaquemines Parish Police Jury, Buras Levee Board, Grand Prairie, Plaquemines Parish School Board, etc., including any and all 16th sections lands, since the organization of the said Delta Development Co. to the present time.
Be it further resolved, that the said Delta Development Company, Inc. be placed on immediate notice, that the PPCC is hereby making demand for the return of any and all money derived by it and its stockholders at the expense of the public as hereinabove enumerated.
Be it further resolved, that the said Delta Development Company, Inc., its stockholders and assigns, are hereby put on notice that they are ordered to cease and desist from making any profit from public lands, and that any and all profits, from this day forward, be immediately turned over to the Plaquemines Parish Commission Council, as the lawful beneficiary of any and all profits to be derived from public lands,
Be it further resolved, that Chalin Perez, Lea Perez, Joyce Perez, Betty Perez, be called upon to render a complete and formal accounting of their interests in Delta Development Co., Inc., and to make restitution of those public funds which have been unlawfully diverted to their use and benefit, and to the use and benefit of their progenitor.
Be it further resolved, that each and every oil company, gas company, production company, pipeline company, sulphur company, individual, or organization of any kind, which is profiting from leases on lands now or formerly belonging to the public, and which is paying royalties, rentals or making payments of any kind to the said Delta Development Company, its stockholders or assigns, be hereby put on notice, that the continued diversion of public funds will no longer be tolerated by the Plaquemines Parish Commission Council.
Be it further resolved, that the following companies be notified, by certified mail of the contents of this resolution, and that they be further notified that demand is hereby made upon them, and they are hereby charged with the responsibility of turning over to the Plaquemines Parish Commission Council any and all rents, profits or *1342 royalties from this day one, which it would otherwise pay to the said Delta Development Company, Inc., its stockholders or assigns, insofar as said monies represent profits on public lands.
Be it further resolved, that notice go out by certified mail to the following companies, said notice to contain copies of this resolution, informing them that the continued diversion of monies realized from the use of public lands to the heirs of the late “Judge” Perez, and to the Delta Development Co. Inc., or any other company founded by him for the purpose of bilking the public, will no longer be tolerated, and that the Plaquemines Parish Commission Council intends to take every legal action necessary, whether criminal or civil, to insure that this monstrous wrongdoing be brought to an end.
It is further resolved that John Volz, United States Attorney, for the Eastern District of Louisiana and the United States Department of Justice be, and they are hereby requested to take whatever criminal and/or civil actions as may be necessary to secure the return of all School Board, Levee Board, and other public lands and monies to the public bodies to which they previously belonged, and to prosecute such actions against Delta Development Company, Inc., its shareholders and assigns, and any other persons or corporations to whom such lands or monies have been unlawfully diverted.
Amoco Oil Company
Bass Enterprises
Chevron Oil Company
Exxon Oil Company
Getty Oil Company
Gulf Oil Company
Hassie-Hunt Oil Company
Koch Oil Company
Ladd Oil Company
McMoran Oil Company
Placid Oil Company
Signal Oil Company
Tenneco Oil Company
Texas Instruments
Hilliard Oil & Gas Company
Ladd Petroleum
C & K Petroleum
Permian Oil Company
Marathon Oil Company
John Volz, United States Attorney
United States Department of Justice, Washington, D.C.
Chalin Perez
Leander Perez, Jr.
Joyce Perez
Betty Perez

. In view of this finding, we do not address the allegations of other grand jury irregularities, i.e., violations of the secrecy of the grand jury proceedings and the preparation of indictments by unauthorized persons.