liLOBRANO, Judge.
Defendant, Arlen Deville, was indicted by a St. Landry parish grand jury on three (3) counts of malfeasance in office, violations of Louisiana Revised Statute 14:134.
On October 16, 1992, defendant pled not guilty on ah counts.
On January 25, 1993,. defendant filed a motion for a change of venue due to extensive pretrial pubheity. The motion was granted and the case was transferred to the Criminal District Court in Orleans Parish.
On February 8, 1993, the State filed an amended bill of information charging defendant with four (4) counts of malfeasance in office.
On February 16,1993, prior to trial, defendant filed a Motion to Quash asserting the State failed to allege an offense. Defendant argued that all counts against him were based upon the purported violation of his oath of office and that this general oath did not satisfy the jurisprudential requirement of (1) the introduction of a statute or provision of law which delineates an affirmative duty upon the official and (2) the showing required that the duty was expressly imposed by law upon the official. The motion was denied.
On February 17, 1993, following a two day trial, defendant was found guilty as charged on all counts.
On June 3, 1993 defendant was sentenced to serve concurrent four (4) year sentences at hard labor on each count. The sentences were suspended and defendant was placed on four (4) years active probation with the special conditions that (1) defendant serve nine *1119 ty (90) days in the parish prison, (2) make restitution to the victims for any out-of-|2pocket expenses incurred and (3) that defendant neither run for nor hold any public office during the course of his probation. FACTS:
On December 21, 1990, defendant was sworn in as the duly elected Chief of Police of Washington, Louisiana. Defendant’s Oath of Office is as follows:
“I, Arlen D. Deville do solemnly swear (or affirm) that I will support the Constitution and Laws of the United States and the Constitution and Laws of this State and that I will faithfully and impartially discharge and perform all the duties incumbent on me as: Chief of Police according to the best of my ability and understanding, so help me God.”
During his tenure as Chief of Police, the following incidents occurred which led to defendant’s arrest.
On January 16, 1991, defendant fabricated a traffic violation against Allen Moten, a resident of the town of Washington. Defendant instructed a subordinate officer, Kenneth Minor, to falsify a traffic citation and to he under oath that a radar device was used in determining the speeding violation of Mo-ten. Out of fear of losing his job, Officer Minor falsely testified at the Mayor’s court trial which resulted in a conviction of Moten, who was condemned to pay a fine.
On April 15, 1992, George Golden was arrested for various misdemeanor offenses. He was taken into custody and handcuffed on the orders of defendant. Golden was then transported to the town police station and jail. While there defendant, for no apparent reason, physically attacked Golden while Golden’s hands were handcuffed behind his back. The attack was of such a nature that the booking office, Joe Richard, intervened to prevent further abuse to Golden.
On January 11, 1993, defendant received word from his office that a knife-cutting incident had occurred in town. Without probable cause and without a warrant defendant, for unknown reasons, proceeded to the home of Anthony Baker with the intent to arrest him for aggravated battery. Defendant became violent when other household members protested Baker’s illegal arrest. Defendant repeatedly struck Anthony Baker withjjhis night stick rendering him unconscious. When Baker’s mother, Mae Belle Lockett, attempted to stop defendant from further striking her son, defendant struck Lockett in the forehead with his night stick.
Defendant appeals his conviction on four (4) counts of malfeasance in office asserting that neither the crimes charged nor the evidence adduced at trial satisfied the jurisprudential requirement of:
1) The introduction of a statute or provision of law which delineates an affirmative duty upon the official (defendant) and;
2) The showing required that the affirmative duty was expressly imposed by law upon the official (defendant).
Thus, defendant argues that the indictment filed against him failed to allege the offense of malfeasance and the evidence adduced at trial failed to support a conviction of the crime of malfeasance in office. We disagree.

SUFFICIENCY OF EVIDENCE:

The standard for reviewing a claim of insufficient evidence is whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La.1987); State v. Fuller, 414 So.2d 306 (La.1982).
Nevertheless, the reviewing court may not disregard its duty to consider whether the evidence is constitutionally sufficient simply because the record contains evidence that tends to support each fact necessary to constitute the crime. State v. Mussall, 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. Mussall, supra. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecu *1120 tion must be adopted. Mussáll, supra. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. Mussall, supra.
UThe bill of information, upon which defendant’s convictions are based, charged defendant as follows:
COUNT I.
On or about January 16, 1991 through March 18,1991 violated R.S. 14:134 in that he being a public officer, to wit: the duly sworn the Cheif [sic] of Police of the Town of Washington, Louisiana, committed malfeasance in office by intentionally failing to perform the duties lawfully required of him as said officer and intentionally performed said duties in an unlawful manner. More specifically, as Chief of Police he is sworn to support the Constitution and Laws of the United States and the Constitution and Laws of Louisiana and to faithfully and impartially discharge and perform all the duties incumbent upon him as Chief of Police of the Town of Washington, La. While he was such duly sworn officer, he instructed and allowed a town police officer, one Kenneth Minor to commit perjury in the case of Allen Wayne Moten on a traffic charge before the Town of Washington Mayor’s Court; Mayor Kirt Soileau presiding.
COUNT II.
That said ARLEN DEVILLE on or about April 15, 1992 violated R.S. 14:134 in that he being a public officer, to wit: the duly sworn Chief of Police of the Town of Washington, Louisiana, committed malfeasance in office by intentionally failing to perform the duties lawfully required of him as said officer and intentionally performed said duties in an unlawful manner. More specifically, as Chief of Police he is sworn to support the Constitution and Laws of the United States and the Constitution and Laws of Louisiana and to faithfully and impartially discharge and perform all the duties incumbent upon him as Cheif [sic] of Police of the Town of Washington, La. While he was such duly sworn officer, he arrested one George Golden, a resident of the Town of Washington and had him transported to the Washington town jail. At that location and while said George Golden had his hands handcuffed behind his back, said Arlen Deville committed a battery upon said prisoner.
COUNT III.
That said ARLEN DEVILLE on or about January 11, 1993 violated R.S. 14:134 in that he being a public officer, to wit: the duly sworn Chief of Police of the Town of Washington, Louisiana, committed male-faesanee [sic] in office by intentionally failing to perform the duties lawfully required of him as said officer and intentionally performed said duties in an unlawful manner. More specifically, as Chief of Police he is sworn to support the Constitution and Laws of the United States and the Constitution and Laws of Louisiana and to faithfully and impartially discharge and perform all the duties incumbent upon him as Chief of Police of the Town of Washington, La. While he was such duly sworn officer, he without probable cause and without an arrest warrant, illegally |5arrested, falsely imprisoned and committed a battery upon Anthony Baker.
COUNT IV.
That said ARLEN DEVILLE on or about January 11, 1993 violated R.S. 14:134 in that he being a public officer, to wit: the duly swonr [sic] Chief of Police of the Town of Washington, Louisiana committed malfeasance in office by intentionally failing to perform the duties lawfully required of him as said officer and intentionally performed said duties in an unlawful manner. More specifically, as Chief of Police he is sworn to support the Constitution and Laws of the United States and the Constitution and Laws of Louisiana and to faithfully and impartially discharge and perform all duties incumbent upon him as Chief of Police of the Town of Washington, La. While he was duly sworn officer and during the course of the conduct specified in Count III above he, also committed a *1121 battery upon Mae Belle Lockett, the mother of said Anthony Baker when she intervened on behalf of her son.
Louisiana’s malfeasance in office statute, R.S. 14:134 provides:
“Malfeasance in office is committed when any public officer or public employee shall:
(1) Intentionally refuse or fail to perform any duty lawfully required of him, as such officer .or employee; or
(2) Intentionally perform any such duty in an unlawful manner; or
(3) Knowingly permit any other public officer or public employee, under his authority, to intentionally refuse or fail to perform any duty lawfully required of him or to perform any such duty in an unlawful manner.
Any duty lawfully required of a public officer or public employee when delegated by him to a public officer or public employee shall be deemed to be a lawful duty of such public officer or employee. The delegation of such lawful duty shall not relieve the public officer or employee of his lawful duty.”
To prove malfeasance in office, the State is required to prove (1) that defendant held an official public office, and (2) that defendant violated a lawfully required duty by failing to perform it or performing it in an unlawful manner.
Defendant argues that neither the indictment nor the evidence prove the affirmative duty expressly imposed by law which defendant violated. This essential “missing link”, defendant argues, requires either the quashing of the indictment or reversal of his conviction.
16Pefendant argues that the specific criminal statutes he violated do not impose the affirmative duty the malfeasance statute requires. Simply put, defendant asserts that his Oath of Office did not impose the affirmative duty not to violate specific criminal statutes, and thus he cannot be charged or convicted of malfeasance. In support of this contention, defendant relies on the Supreme Court’s holding in State v. Perez, 464 So.2d 737 (La.1985):
“Before a public official can be charged with malfeasance in office, there must be a statute or provision of law which delineates an affirmative duty upon the official. The duty must be expressly imposed by law upon the official because the official is entitled to know exactly what conduct is expected of him in his official capacity and what conduct will subject him to criminal charges.” at p. 741, citing, State v. Passman, 391 So.2d 1140 (La.1980). (emphasis added)
In Perez, the high court affirmed in part and reversed in part. The court held that the bill of information charging the district attorney with failure to inform the grand jury of its right to review its early dismissal and with filing criminal charges against the foreman in bad faith and without probable cause did not state a charge of malfeasance. In so holding, the court found that there was no affirmative duty inherent in the office of district attorney to inform the grand jury of its right of review when prematurely discharged and that there is no provision of law defining or limiting the type of case a district attorney may prosecute. However, the court did find that their oath of office did impose upon the district attorney and the district judge the affirmative duty not to interfere with or prevent the grand jury from performing its duties. The defendants’ false representations and premature discharge of the grand jury constituted a violation of that duty.
In some respects, State v. Perez is supportive of the general legal principles defendant relied on, however we find the reasoning of State v. Coker, 625 So.2d 190 (La.App. 3rd Cir.1993), writ den. 624 So.2d 1204 (La.1993) more appropriate to the instant case. The facts in Coker are similar, and the court provides a succinct analysis of the affirmative duties which are inherent in the office of Chief of Police. We rely on that analysis in deciding the instant case.
The defendant in Coker was Chief of Police of the town of Glenmora, Louisiana. On April 3,1992, the Glenmora Police responded to a disturbance call at the ^residence of Chris Woodham. Upon arrival, the officers found Woodham in an altercation with a fe *1122 male. Another man, Billy Marshall, was attempting to separate them. Both men were intoxicated. The police asked both men to accompany them to police headquarters. The men were cooperative and offered no resistance. After being informed of the disturbance, Chief Coker arrived at the station at the same time as the suspects. As Wood-ham exited the police vehicle, he was approached by Coker who began cursing him and backed him against the police vehicle. Coker then slapped Woodham several times across the arms and face. Woodham ran toward the railroad tracks. Coker yelled for him to return “or he was gonna whip his ass.” Woodham stopped and began to walk back to the police station. Coker then turned to Marshall and began slapping him. He then picked Marshall up and threw him backwards over the hood of the police vehicle. Both men were taken inside and placed in the front cell. Coker retrieved a key to the cell and attempted to unlock the door. Woodham grabbed the bars of the door and attempted to hold it closed. Coker pushed on Woodham’s hands and arms and struck his fingers in an attempt to force open the door. A deputy who smelled the odor of alcohol on Coker’s breath persuaded him to leave the area.
In appealing his conviction and sentence, Coker, like defendant in the instant case, vigorously argued his oath of office did not delineate any affirmative duty not to batter suspects and thus there was no basis for a malfeasance conviction. In rejecting defendant’s argument, the Court reasoned:
“... the defendant contends that a public official can never be convicted of malfeasance unless a specific criminal statute exists which defines the conduct as malfeasance. In the defendant’s case, he asserts that he cannot be found guilty of malfeasance for maliciously battering helpless prisoners unless a statute exists which requires that ‘law enforcement officials shall ensure the safety, health and well being of all citizens or persons in their presence or custody, and ensure no batteries are committed upon the person who is in their custody or presence.’ Utilizing the defendant’s reasoning, every conceivable function and duty of a public official would have to be specifically included in a prohibitory statute in order to successfully ‘notify’ the official of his potential liability for malfeasance. This is clearly impossible in practice and was obviously not the intent of the legislature when enacting the malfeasance statute.
| gin fact, only two offenses are specifically delineated in Louisiana as constituting malfeasance. See La.R.S. 14:134.1 and La. R.S. 14:134.2. In all other cases, the specific duties required to support conviction for malfeasance are derived from other sources.
Specific criminal statutes and ordinance have been used to support malfeasance convictions, (citations omitted) ...
⅜ ⅜ ⅜ ⅜ ⅜ ⅜
The oath of office has also been held to independently express certain affirmative duties. In Perez, supra, a judge was found to be under an express affirmative duty not to interfere with or obstruct the grand jury, based on his oath of office. In State v. Perret, 563 So.2d 459 (La.App. 1st Cir. 1990), an employee of the Department of Wildlife and Fisheries was found to have an express affirmative duty not to interfere with the execution of provisions of La.R.S. 56:433, pursuant to his oath of office.
* * ⅜ * * *
When police officers use unreasonable force, and the police conduct shows reckless and callous indifference to the rights of others, that conduct violates constitutional prohibitions against unreasonable seizures ... Certainly, when the chief performed in this fashion, he did so unlawfully, misused and abused his power, and thus, is guilty of the misuse and malfeasance of his office.
* * * * * #
Clearly, the malfeasance statute requires that the offender be acting in his official capacity and engaged in the performance of a duty which is required by law, in order to support conviction. The jurisprudence indicates that prosecution for malfeasance is reserved for those cases in which a *1123 public official has blatantly abused the authority of his office and violates the public trust by his direct, personal acts or failure to act.” Id. at 195, 197, 198.
We adopt the above quoted language as our legal basis for concluding that the bill of information which included reference to defendant’s oath of office properly charged the offense of malfeasance in office. In addition we note the elementary fact that certain affirmative duties are inherent in the nature of the office. Certainly police officers have the duty not to break the law when performing the duties of their office. Our review of the evidence convinces us that it is sufficient to sustain the jury’s conclusion that defendant is guilty of malfeasance.
_JgAllen Moten testified that he was found guilty of a charge of exceeding the speed limit brought by Chief Arlen Deville. At trial he stated that he, Chief Deville and Officer Kenneth Minor were the only witnesses to testify before the Mayor’s Court. He stated that at the time of his arrest he was told that he had been “clocked” by radar over the speed limit. He testified that he saw no radar gun inside the police car when he was transported to the police station.
Officer Kenneth Minor testified that he was involved in the issuance of traffic citations to Allen Moten on or about January 16, 1991. He also stated he completed the police report connected with the incident. Minor stated that while he and defendant were driving around, they observed Moten driving at what appeared to be an excessive rate of speed. No radar gun was used to determine Moten’s speed as none was in the car. He testified that on orders of defendant, he falsely testified under oath before the May- or’s Court that radar was used to determine Moten’s speed. When asked if he would have lied if defendant had not directed him to do so, Minor responded “No, Sir.”. When asked why he obeyed defendant and perjured himself, Minor responded, “because I wanted my job.”
George Golden testified that on April 15, 1992 at approximately 9:30 p.m. he was arrested by defendant outside a relative’s apartment. He stated he was arrested, handcuffed and transported to the police station. Once inside, defendant began beating Golden in the face while his hands were handcuffed behind his back. Golden denied resisting arrest or striking defendant.
Joseph Richard testified that on the night of April 15,1992 he was employed as a police officer for defendant. He stated he was the booking officer at the police station. He testified that defendant brought Golden in for booking and that Golden was handcuffed. Defendant began striking Golden in the face with his fists. Golden’s face was swollen and his lips were bloody. When asked why he did not write into the police report that defendant struck Golden, Richard stated “it’s called job protection.”
Junius Bell testified that on the night of January 11,1993 he was cut by a man named Nathanial “Man” Johnson. He reported the incident to the police department. He stated he knows Anthony “Man” Baker but never reported that Baker cut him.
I ipCharles Laurent testified that on the night of January 11, 1993 he was employed as a police officer for defendant. That night Junius Bell told him he had been slashed with a knife by “Man” Johnson. After calling for an ambulance, Laurent contacted defendant and apprised him of the situation and that Man Johnson was the attacker. Defendant directed him to call for assistance before proceeding to arrest Johnson. Shortly thereafter, defendant contacted Laurent and informed him that he was enroute to the suspect’s residence. While waiting for his back-up to arrive, Laurent received another call from defendant. Defendant was breathing hard and said there had been a struggle. Laurent then proceeded to Johnson’s home on Gordon Street. When he arrived several people informed him that defendant was around the comer. He drove around and spotted the Chiefs car. As he approached the house, defendant exited and pointed to the steps leading up to the house and stated Man Baker met him outside. When Laurent went inside, he saw a black male lying on the floor. He was handcuffed and bleeding severely from the head. Laurent assumed the male was Man Johnson. He stated he smelled alcohol on defendant’s breath. An *1124 ambulance transported the black male to the hospital. Laurent also observed several women in the home. One of them, Mae Bell Lockett, was cut on the forehead. Later that night Laurent learned that defendant had gone to the wrong house and that the black male was Anthony “Man” Baker.
Anthony “Man” Baker testified that on the evening of January 11, 1993, he was home watching television with his mother, Mae Bell Lockett and his sister, Theresa and nephew, Herman. A knock was heard at the front door. The person identified himself as Arlen Deville. Baker’s mother opened the door. Defendant stepped inside and told Baker he was under arrest. When Baker asked why, defendant struck him in the head with his night stick. Baker fell to the floor. Defendant then handcuffed Baker and struck him again on the head rendering him unconscious. Baker testified that he did nothing to provoke the attack.
Mae Bell Lockett testified that on the night of January 11, 1993, her son Anthony Baker was home watching television. Defendant arrived at her home. When she opened the door, defendant informed Baker that he was under arrest. When Baker asked I nwhy, defendant struck him in the head with his night stick. Baker fell to the floor. While handcuffed, defendant struck him again. Lockett stated that when she intervened to stop defendant from striking Baker a third time, defendant struck her in the forehead with the night stick. Lockett stated that at no time did her son provoke the attack.
Theresa Baker testified that on the night of January 11, 1993, defendant came to her mother’s home. After being let into the home, defendant informed her brother that he was under arrest. Her brother repeatedly asked the reason for the arrest but was given no answer by defendant. Instead, defendant then struck Baker twice with his night stick. When her mother, Ella Mae Lockett attempted to intervene, defendant struck her in the forehead with his night stick.
On cross-examination, the witness testified that defendant’s son was the one who retrieved defendant’s handcuffs from the police unit. He also was the only person to tell the witness that her brother was being arrested because he “cut a man.”
Arlen Deville testified on his own behalf about each incident he was charged with.
He stated that he was called to a scene on Garden and Washington Streets because Officer Patrick LaFleur was having trouble. When he arrived he observed George Golden drunk and “loud mouthing”. When Golden refused to move on, defendant placed him under arrest. Golden refused to get into the ear and began scuffling with Officer LaFleur. A girl then got involved tearing defendant’s shirt. Eventually defendant stated he subdued Golden and handcuffed him. Defendant denied punching Golden at the police station while Golden was handcuffed.
Defendant testified that Officer Laurent telephoned him and told him of the cutting incident and that the attacker was someone named “Man”. When defendant asked Laurent if it was Man Baker, Laurent answered “Yeah, I think that’s the one.” He stated he told Laurent that he was proceeding to Baker’s house. When defendant arrived, Baker’s mother opened the door and told him Baker was not at home. However, defendant saw Baker on the couch. Defendant then asked Baker to come to the police station. Baker replied that he was watching television and “wasn’t going nowheres.” He then went outside | laand radioed for back up units because Baker was getting “jittery and he thought he might try to run away.” When he went back inside to talk to him again, Baker tried to grab his night stick. Defendant then clubbed him knocking him to the floor. Defendant then tried to subdue Baker and hollered for his stepson to get his handcuffs from the car. Defendant then attempted to strike him on the shoulder but missed and hit him on the head. When he and his stepson tried to cuff Baker, Baker’s mother grabbed defendant from behind. Not knowing who had jumped him, defendant reached back and pulled her over whereupon she struck her head on either the sofa or end table. Defendant denied he hit her with the night stick. He also testified that he did not hit Baker after Baker was handcuffed.
*1125 Defendant testified that he first spotted Allen Moten while heading north on Main Street. Moten was heading south on Main Street. When Moten saw defendant he slammed on his brakes. He stated Moten was driving recklessly. He testified he had a radar gun and clocked him. He pulled him over. Moten was driving without a license which had been suspended. He informed Moten he was going 42 in a 30 mile zone. Moten was given two tickets for careless and reckless operation. He stated he never instructed Kenneth Minor to perjure himself at Moten’s trial.
The jury heard the above testimony of all witnesses including defendant and found defendant guilty as charged. The credibility of witnesses is for the trier of fact to determine. State v. Green, 613 So.2d 263 (La.App. 4th Cir.1992).
Given the evidence presented, any rational trier of fact could have found that defendant violated not only specific criminal statutes, but also his oath of office wherein he swore to “support the Constitution and Laws of the United States and the Constitution and Laws of this State ... faithfully and impartially
When defendant battered Golden, Baker and Lockett and directed a subordinate officer to manufacture evidence against a defendant and later perjure himself in Court, defendant committed malfeasance of the worst sort. He flagrantly abused his police authority and breached his express and affirmative duty to respect the rule of law and protect citizens from violence and false charges against them. Defendant’s conduct strikes at the heart of the function of a law enforcement officer and demonstrates a fundamental | ^disrespect for the constitutional rights of all citizens which defendant swore to uphold and protect.
For the reasons assigned above, defendant’s convictions and sentence are affirmed.
AFFIRMED.